FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2013 MAY 29 PM 12: 13

CLERK _Cadams_
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 112-255 |
| | ) | |
| FRANTRON CRYSTAL FERGUSON | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has charged Defendant Frantron Crystal Ferguson ("Ferguson") with one count of Possession With Intent to Distribute a Schedule II Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2, and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c). (Doc. no. 1.) The matter is presently before the Court because Ferguson has filed a motion to suppress "any evidence seized or statements made during the course of" a traffic stop that occurred on September 12, 2012. (Doc. no. 34.) The government opposed this motion. (Doc. no. 37.)

Ferguson has submitted an affidavit and a copy of the incident report regarding the September 12th encounter in support of her motion (doc. nos. 34-2, 34-3), and on April 24, 2013, an evidentiary hearing was held, during which the Court heard testimony from Deputy Jared Land of the McDuffie County Sheriff's Office. At the hearing, the government submitted a series of exhibits, including a video recording of the September 12th traffic stop. Following the hearing, the Court granted Ferguson ten days to acquire a transcript of that hearing and ten days to file supplemental briefing, and it additionally granted the government

ten days to respond to that supplemental briefing. Accordingly, both parties have submitted supplemental briefs, although a transcript of the hearing has yet to be prepared. (Doc. nos. 51, 52.) For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Ferguson's motion to suppress be **DENIED**.

I.  **FACTS**

On September 12, 2012, Deputy Land was on duty and sitting stationary approximately one half-mile east of the 172 mile marker on Interstate 20 observing eastbound traffic. (FTR 2:00:01-00:23.) At the time, Deputy Land, along with a canine, was parked in a Chevrolet Tahoe marked as a sheriff's vehicle that was equipped with video recording equipment designed to begin recording upon activation of the vehicle's blue lights or upon manual activation. (FTR 2:00:40-01:25; 3:01:58-02:05.) Around 11:18 P.M., Deputy Land observed two tractor-trailers entering the interstate by way of the Exit 172 entrance ramp, as well as Ferguson traveling eastbound in the outside lane of the interstate in a silver Chevrolet Impala. (FTR 2:01:25-01:56.) After the tractor-trailers and Ferguson passed him, Deputy Land observed Ferguson approach the rear of one of the tractor-trailers – which had already established its lane on the interstate after leaving the entrance ramp – at a distance of approximately "half a car length," and thereafter "slam on [her] brakes" and shift into the inside lane.[1] (FTR 2:01:56-02:08; 3:06:10-06:59.) At that point, having

---

[1] Deputy Land testified that he observed the traffic incident occur approximately thirty-five yards to his right – traveling away from him – after both the tractor-trailer and Ferguson had passed his stationary vehicle. (FTR 3:07:00-07:08.)

2

observed a violation of O.C.G.A. § 40-6-49(a),[2] Deputy Land pulled out behind Ferguson on the interstate and activated his blue lights such that the video equipment began recording the traffic stop. (FTR 2:02:10-02:30.) The video of the traffic stop shows the tractor-trailers passing by Deputy Land on the interstate shortly after he pulled over Ferguson, as Ferguson had already passed the tractor-trailers at that time. (FTR 2:02:32-02:41.)

After pulling Ferguson over to the shoulder of the interstate, Deputy Land approached the passenger side of Ferguson's vehicle. (FTR 2:02:42-03:03.) Because Ferguson had only rolled the passenger window down approximately three inches, Deputy Land requested that she roll it down further, at which point she complied by rolling it down approximately three more inches, thereby causing Deputy Land to be "hit" by the smell of a "masking odor" emanating from a "Black Ice" air freshener hanging from the rearview mirror. (FTR 2:03:05-03:31.) Deputy Land then requested that Ferguson provide him with her license and insurance. (FTR 2:03:32-03:41.) Ferguson opened the glove compartment of her vehicle to retrieve her insurance card, causing a small-caliber semiautomatic handgun to fall out of the glove compartment. (FTR 2:03:41-03:59.) Ferguson stated that she had a permit for the gun. (FTR 2:04:00-04:05.) Deputy Land subsequently asked Ferguson if he could take the gun for safety reasons, and Ferguson said yes; Deputy Land then placed the gun on top of the car while he conducted the traffic stop. (FTR 2:04:05-04:12.) Deputy Land testified that, even if Ferguson had not agreed to allow him to seize the weapon, he would have done so for the duration of the traffic stop for purposes of ensuring his safety. (FTR 2:04:14-04:52.)

---

[2]O.C.G.A. § 40-6-49(a) reads, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and condition of the highway."

3

After seizing the gun, Deputy Land continued to talk to Ferguson and noted that she was breathing heavily, appeared to be extremely nervous, and exhibited a "thousand-yard stare." (FTR 2:05:00-05:18.) Deputy Land advised Ferguson as to his reason for initiating the traffic stop and then, in order to remove her from the proximity of the masking odor and determine whether she was under the influence of any medication or alcohol, asked her to exit her car and approach the front of his patrol vehicle while he completed the traffic ticket. (FTR 2:05:18-06:24) In response to Deputy Land's explanation as to why he had initiated the traffic stop, Ferguson stated that she was unaware that she had approached the tractor-trailer so closely and that she was sleepy and tired from driving. (FTR 2:06:06-06:12.)

Deputy Land asked Ferguson a number of questions concerning her origin of travel and destination, and Ferguson initially stated that she was returning to her home in Augusta, Georgia, and that she had been at her god-sister's house in Gwinnett County for about four hours. (FTR 2:06:38-06:52.) After further questioning, however, Ferguson revealed that she had in fact been visiting her brother's god-sister, not her own. (FTR 2:06:52-07:14.) When Deputy Land asked Ferguson if she was traveling with any luggage, she initially replied that she was not, but she admitted to ownership of a bookbag on the floorboard of her car behind the driver's seat when Deputy Land asked about it in particular. (FTR 2:07:14-07:38.)

Once at his patrol car, Deputy Land checked the registration of Ferguson's firearm through the National Crime Information Center to determine whether it was stolen[3] and thereafter began to draft the written warning citation for the traffic violation. (FTR

---

[3] The video of the traffic stop indicates that Deputy Land received the registration check on the firearm approximately eight minutes into the traffic stop. Those results indicated that the firearm was not stolen. (FTR 2:08:05-08:07.)

4

2:07:56-08:12; see also doc. no. 34-2, p. 1.) Deputy Land continued to speak with Ferguson, who initiated conversation with him numerous times concerning such matters as his patrol car, how he liked it, and Richmond County's new patrol cars; during those conversations, Deputy Land attempted to divert the discussion back to the matter of the traffic stop in order to finish drafting the warning citation. (FTR 2:08:13-08:32.) When Deputy Land asked Ferguson whether she was traveling with anything illegal, Ferguson looked to her left – motioning her head "no" – and verbally expressed, "Mmm mmm." (FTR 2:08:34-09:00.) Deputy Land then asked Ferguson a series of questions concerning whether she was traveling with any specific items, including marijuana, cocaine, methamphetamine, and heroin, and Ferguson responded in the negative as to each item. (FTR 2:09:20-09:35.) Specifically, as shown in the police dash camera video beginning at 16:05, Ferguson expressed "Mmm mmm," accompanied by a shake of her head, to indicate a negative response to four of Deputy Land's questions concerning whether she was traveling with those items.

Following that line of questioning, as shown at 16:20 of the police dash camera video, Deputy Land asked Ferguson, "You don't have a problem if I search your vehicle, do you?" (FTR 2:10:04-10:06.) Deputy Land testified that Ferguson then, in response to his question, verbally expressed, "Mmm mmm," which was consistent with Ferguson's responses to his prior questions and which Deputy Land thus interpreted as a negative response indicating that she did not mind if he so searched. (FTR 2:10:06-10:17; see also doc. no. 37, p. 2.) Deputy Land then responded, "I appreciate that." (FTR 2:38:34-38:53.) Ferguson disputes Deputy Land's testimony as to Ferguson's response, and argues that she did not at any point expressly give Deputy Land verbal or written consent to search

5

her vehicle. (See doc. no. 34-3, ¶ 6.) At that time, Deputy Land had yet to complete the warning citation or to return Ferguson's driver's license to her. (FTR 2:10:22-10:34.) Shortly after Deputy Land asked for consent to search Ferguson's vehicle, Deputy Alan Baldwin, Deputy Land's partner for the night, arrived in a separate vehicle; Deputy Land explained to Deputy Baldwin that he had received consent to search and was preparing to do so. (FTR 2:10:39-11:00.) Although Deputy Land's conversation with Deputy Baldwin took place within earshot of Ferguson, she made no response to Deputy Land's statement that he had acquired consent to search her vehicle. (FTR 2:38:53-39:15.)

Deputy Land then walked immediately to Ferguson's vehicle – while Ferguson turned to watch him do so – opened the rear passenger door, and retrieved the bookbag from behind the driver's seat. (FTR 2:11:22-11:42.) When Deputy Land unzipped the bookbag, he detected the smell of raw cocaine, whereupon he opened one of the individually-wrapped bags inside the bookbag, identified four individual kilograms of cocaine (doc. no. 34-2, p. 2), and advised Ferguson that she was under arrest. (FTR 2:11:42-12:10.)

## II. DISCUSSION

Ferguson presents three distinct arguments in support of her motion to suppress. Specifically, Ferguson argues: (1) that the initial traffic stop was unlawful because Deputy Land did not have probable cause to believe that Ferguson had committed a traffic violation; (2) that the seizure of Ferguson and the subsequent search of her vehicle were beyond the scope of the initial stop, and the stop itself was unreasonably prolonged; and (3) that Ferguson did not give Deputy Land consent to search her vehicle. (See doc. no. 34-1.) The Court will address each of Ferguson's arguments in turn below.

### A. Initial Traffic Stop Was Lawful

#### 1. Credibility

During the hearing, defense counsel attempted to demonstrate certain inconsistencies in the government's testimonial and documentary evidence as to the validity of the initial traffic stop, which raises the threshold issue of credibility. In repeatedly questioning Deputy Land as to his position on the shoulder of the interstate when he observed Ferguson commit the traffic offense of "following too closely," defense counsel argued – or, at the very least, strongly implied – that Deputy Land, based on his position, could not have actually observed such an offense. (FTR 2:40:00-43:00.)

Credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Here, the Court credits Deputy Land's testimony that, from his stationary position approximately one half-mile east of the 172 mile marker, he observed Ferguson brake "so suddenly" as she approached the rear of a tractor-trailer that her vehicle's brake lights flashed and she was forced to shift into the inside line. (FTR 2:43:25-43:31.) Defense counsel's apparent argument to the contrary – that Deputy Land could not have made such an

observation – appears to be predicated on counsel's faulty understanding of Deputy Land's perspective from his vantage point. Specifically, defense counsel attempts to describe the incident as having occurred to Deputy Land's left, such that both the tractor-trailer and Ferguson's vehicle were *approaching* Deputy Land's position when the incident occurred and Deputy Land's view of Ferguson's vehicle was thus obstructed by the tractor-trailer ahead of it. (FTR 2:43:31-43:36.) It is apparent, however, that such was not the case.

In attempting to describe the incident as having taken place in that manner, defense counsel appears to have misunderstood Deputy Land's testimony that both the tractor-trailer and Ferguson's vehicle passed in front of him prior to the occurrence of the traffic violation. (FTR 2:41:44-42:20.) Regardless, any confusion as to Deputy Land's position that arose during defense counsel's cross-examination of Deputy Land was later clarified during re-direct examination. During re-direct examination, Deputy Land clearly testified – consistent with his prior testimony – that the vehicles were positioned approximately thirty-five yards to his *right* at the time of the traffic incident, after both the tractor-trailer and Ferguson's vehicle had passed him, such that he was provided with an uninterrupted view of the rear of Ferguson's vehicle and the tractor-trailer in front of her vehicle. (FTR 3:05:28-07:07.) Accordingly, the Court credits Deputy Land's testimony as to the relative positions of Ferguson's vehicle and the tractor-trailer.

### 2. Probable Cause to Believe Traffic Violation Was Committed

Where a party moves for the suppression of evidence, the movant bears the initial burden of showing that she was subjected to a search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden

8

then shifts to the government to show that the encounter was consensual or that the search or seizure was justified. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977)[4]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975).

As explained above, Ferguson argues that Deputy Land did not have probable cause to effectuate a traffic stop. Notably, the entirety of Ferguson's argument in her motion to suppress concerning the supposed illegality of the traffic stop was based on a mischaracterization of the incident and an apparent misreading of Deputy Land's traffic report: specifically, Ferguson argued that her vehicle and the tractor-trailer were not traveling in the same lane at the time of the alleged traffic incident, such that O.C.G.A. § 40-6-49(a), the Georgia statute pursuant to which she was ultimately pulled over, did not apply. (See doc. no. 34-1, pp. 3-6.) In support of that argument, Ferguson cited to State v. Torrance, 217 Ga. App. 562, 563 (1995), wherein the court found that defendant was not "following too closely" pursuant to the language of that statute when he was not in the same lane as the truck with whom he collided prior to that collision.

However, as correctly argued by the government in its brief in response to the motion, the circumstances Ferguson describes and the case to which she cites present facts that are, in fact, directly contrary to the reality of the instant circumstances. (See doc. no. 37, p. 4.) Deputy Land's traffic incident report clearly describes Ferguson's vehicle as "following too closely *behind*" the tractor-trailer, "travel[ing] up *behind*" the tractor-trailer, and then nearly striking "the *rear end* of the trailer" before shifting into the inside lane. (Doc. no. 34-2, p.

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

9

1) (emphasis added). Deputy Land's testimony at the suppression hearing confirms the same. (FTR 2:43:25-43:31.) Thus it is clear, given that Ferguson's vehicle and the tractor-trailer were traveling in the same lane when the near-collision occurred, that the incident is firmly within the purview of O.C.G.A. § 40-6-49(a). Notably, Ferguson did not raise her argument that the two vehicles were traveling in different lanes during the suppression hearing, and instead turned her focus to her new argument – which was not raised in her brief – that Deputy Land could simply not have observed the traffic incident from his position. (FTR 2:43:31-43:36.) However, as explained supra, the Court credits Deputy Land's testimony that the incident occurred to his *right* after both vehicles had passed him, such that he in fact had a clear view of the incident. Thus, the Court concludes that Deputy Land observed Ferguson act in violation of O.C.G.A. § 40-6-49(a) and thereby commit a traffic violation.

Having determined that a traffic violation occurred, the Court easily concludes that the initial traffic stop was legal. It is well-settled that regardless of subjective intent, an officer may stop a vehicle if he has probable cause to believe that the driver has violated the traffic code.␣Whren v. United States, 517 U.S. 806, 813 (1996). Here, Deputy Land clearly had probable cause to believe that Ferguson had acted in violation of O.C.G.A. § 40-6-49(a) – in that he observed the offense occur – and thus the initial traffic stop was legal.

### B.  Scope and Duration of Stop Was Legal

Ferguson's next argument is that her seizure and the subsequent search of her vehicle were beyond the scope of the traffic stop and that, moreover, the duration of the traffic stop was unreasonably prolonged. (See doc. no. 34-1, p. 6.)

"A traffic stop . . . is constitutional if it is either based upon probable cause to believe

a traffic violation has occurred or justified by reasonable suspicion . . . ." United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). The reasonableness of an investigative stop, including a traffic stop, turns on two inquiries: (1) whether the stop was reasonable at its inception, and (2) whether the stop became unreasonable in its scope or duration. See United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004). Moreover, "[t]he duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). However, "[a]n officer conducting a routine traffic stop may request consent to search the vehicle." Id. at 1281 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). Additionally, when the driver voluntarily consents to a search of her vehicle, "the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given." Purcell, 236 F.3d at 1279 n.8. Finally, an officer cannot detain the vehicle or its occupants following the completion of the purposes of the initial traffic stop unless something that occurred during the traffic stop generated reasonable suspicion that might warrant further detention. United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (citing United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995)).

1.   **Scope**

Here, Ferguson makes much of the series of questions that Deputy Land asked her after initiating the traffic stop and pulling over her vehicle. (Doc. no. 34-1, pp. 8-11.) In fact, Ferguson goes so far as to provide an exhaustive list of the questions that Deputy Land posed to her, and she additionally classifies those questions as a "fishing expedition." (Id. at 8-10.) In presenting that list in her brief, Ferguson appears to argue that Deputy Land's

11

questions were outside the proper scope of the traffic stop, an argument that defense counsel echoed during the suppression hearing. (FTR 2:52:32-56:13.)

However, Ferguson's argument is entirely unpersuasive, especially given the relatively innocuous nature of Deputy Land's line of questioning. In fact, as indicated by Deputy Land's testimony (FTR 2:03:32-09:35) and confirmed by the police dash camera footage, Deputy Land's supposed "fishing expedition" consisted entirely of questions related to the traffic stop itself – such as a request for Ferguson's license and registration – questions concerning the gun that fell out of the vehicle's glove compartment when Ferguson went to retrieve her vehicle registration, and questions as to whether Ferguson was traveling with anything illegal. Notably, Ferguson does not cite to any authority for the proposition that Deputy Land was somehow prohibited from asking such questions, and relevant case law indicates that such questions during a routine traffic stop are permissible. See Purcell, 236 F.3d at 1279-80 (citing United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993) (noting that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is not itself a Fourth Amendment violation, and that it is not the content of questions but their effect on the duration of the stop that presents a constitutional issue).

Deputy Land's questions all were posed over the course of the traffic stop as he ran a check on Ferguson's gun and license and then proceeded to draft the warning citation; critically, there is no indication whatsoever that they were used to prolong the stop in any way. In fact, Ferguson posed questions to Deputy Land on a number of occasions, indicating that their interaction was at least partly conversational in nature, and Deputy Land testified that he attempted to divert the discussion back to the matter at hand in order to finish drafting

the warning. (FTR 2:08:13-08:32.) Thus, Deputy Land did not exceed the scope of the traffic stop by asking Ferguson questions concerning the traffic stop, her origin of travel and destination, her firearm, or whether she was traveling with any illegal items. See Purcell, 236 F.3d at 1279-80.

### 2. Duration

As to Ferguson's argument that the traffic stop was improperly extended and overly lengthy in duration (doc. no. 34-1, pp. 6-11), that argument is also unavailing. As noted above, "[t]he duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." Id. at 1277. Here, the police dash camera video indicates that less than eighteen minutes elapsed from the time that Deputy Land pulled over Ferguson's vehicle to the time that he discovered the cocaine, and that Ferguson consented to a search of her vehicle after approximately sixteen-and-a half-minutes. Sixteen to eighteen minutes is not an unreasonable duration for a traffic stop. See id. at 1279 (noting that defendant consented to a search of his vehicle fourteen minutes into the traffic stop, that "fourteen minutes is not an unreasonable amount of time for a traffic stop," and that the courts have "approved traffic stops of much longer duration"); see also United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (approving a traffic stop that lasted for fifty minutes). Moreover, at no point during that eighteen-minute traffic stop did Deputy Land attempt to improperly prolong the stop; rather, the video demonstrates that he spent the first eight minutes running checks on Ferguson's license and firearm and, after receiving the results of those checks, spent the following eight minutes drafting the warning citation. See Purcell, 236 F.3d at 1270 (noting that a deputy who effectuated a traffic stop did not unreasonably prolong the

stop by awaiting the results of a criminal background check).

As persuasively argued by the government (doc. no. 37, pp. 5-6), Ferguson's argument that Deputy Land illegally prolonged the stop "beyond the 8:36 mark," which is when he informed Ferguson that her license was valid and that her firearm had "come back clean," misses the mark (doc. no. 34-1, p. 10). Ferguson appears to simply ignore the fact that Deputy Land had just begun writing the warning citation at that point and appears to instead argue that the traffic stop should have ended after Deputy Land had received the results of Ferguson's license and firearm check. (Id. at 10-11.) However, as the government aptly articulates, Deputy Land's receipt of those results did not somehow dictate that the traffic stop was over, given that the purpose of the stop was not to conduct license and firearm checks – although such checks were certainly permissible, Purcell, 236 F.2d at 1278 – but to instead issue a warning citation. (Doc. no. 37, p. 6.) At the time that Deputy Land requested consent to search Ferguson's vehicle, he was still in the process of writing the warning citation.[5] (FTR 2:10:22-10:34.) Thus, the Court finds that the duration of the traffic

---

[5]Even if the Court *were* to find that Deputy Land improperly prolonged the traffic stop beyond the time necessary to effectuate its purpose – which it does not – Deputy Land had amassed a host of factors leading to an articulable suspicion of criminal activity that would have justified a brief investigative detention pursuant to Terry v. Ohio, 392 U.S. 1, 21 (1968) (noting that "in justifying a particular intrusion the police officer must be able to point to specific and articulable facts which . . . reasonably warrant that intrusion"). As to those factors, Deputy Land explained that he smelled a masking agent emanating from a Black Ice air freshener; that Ferguson was nervous, talkative, and breathing heavily; that Ferguson indicated that she had stayed in Gwinnett for four hours to see her god-sister, although she later clarified that she was in fact visiting her brother's god-sister, and had no luggage; and that she was hesitant to claim ownership of the bookbag containing the cocaine on the backseat floorboard of her vehicle. (FTR 2:05:00-07:38.) Thus, although the Court finds that the traffic stop was not prolonged beyond the time necessary to effectuate its purpose, Deputy Land's testimony makes clear that a brief investigative detention would have been justified.

stop was properly limited to the time necessary to effectuate the purpose of the stop. Purcell, 236 F.3d at 1277.

### C. Ferguson Gave Consent to Search Her Vehicle

Finally, Ferguson argues in her original brief, affidavit, and supplemental brief that she never "expressly [gave Deputy Land] verbal or written consent to search her vehicle." (Doc. no. 34-1, pp. 11-13; doc. no. 34-3, ¶ 6; doc. no. 51.) Because the government contends otherwise – arguing that Ferguson did, in fact, give Deputy Land consent to search her vehicle by responding to his request for consent in the same manner that she had responded to his previous questions (doc. no. 37, pp. 7-8; doc. no. 52) – the issue of credibility is again raised.

#### 1. Credibility

As before, the Court credits Deputy Land's testimony. Specifically, the Court credits his testimony that, in response to his question, "You don't have a problem if I search your vehicle, do you?" Ferguson responded in the negative by verbally stating "Mmm mmm," indicating that she did not have a problem with a search. (FTR 2:10:06-10:17; see also doc. no. 37, p. 2.) The Court notes that it is somewhat unclear to what extent Ferguson truly contests this fact, given that she acknowledges that she provided a verbal response of some type but simply argues that it the response was "inarticulate" and thus insufficient to provide valid consent. (See doc. no. 34-1, p. 12; see also doc. no. 51, pp. 3-4.) In particular, Ferguson appears to assign great significance to the fact that she did not speak either the words "yes" or "no" in response to Deputy Land's question, but instead responded with a sound that she describes as "inarticulate." (See generally doc. no. 51.)

15

The Court credits Deputy Land's testimony over Ferguson's untested affidavit, wherein she states that she never provided express consent to search, for a number of reasons. First, Deputy Land's conversation with Ferguson leading up to his request for consent to search her vehicle followed a very regular pattern: Deputy Land would ask Ferguson a question, and she would respond to that question in a variety of ways, including, tellingly, "Mmm mmm," which Deputy Land logically interpreted as a negative answer meaning "no." (FTR 2:08:34-09:00.) Thus, Ferguson's decision to answer Deputy Land's later request for consent in the same fashion was not without precedent within the confines of the conversation, and it was thus pre-established as an answer that Ferguson intended to convey "no," and which Deputy Land understood to convey the same.

Moreover, the video footage captured by the police dash camera at approximately the 16:20 mark clearly shows Deputy Land pose his question as to whether Ferguson minded if he searched her vehicle, Ferguson audibly – and remarkably quickly – respond "Mmm mmm," and Deputy Land in turn respond, "I appreciate that." That exchange squarely comports with Deputy Land's testimony that he felt no need to clarify whether Ferguson gave consent or ask her for written consent because of how unhesitating her answer was. (FTR 3:00:45-01:58.)

Finally, Ferguson's behavior following her response to Deputy Land's request for consent corroborates the government's argument that she gave such consent, in that, as documented in the video footage from 16:30 to 18:00, she made no attempt to correct Deputy Land when he said, "I appreciate that." Additionally, she failed to object to Deputy Land's comment to Deputy Baldwin that she had given consent, and she subsequently simply turned

16

to watch without comment as Deputy Land walked towards her car and began his search. The Court agrees with the government's contention that a person who has in fact denied consent to search would object to one, if not all, of the aforementioned statements and events. (Doc. no. 37, pp. 7-8.) Thus, the Court credits Deputy Land's testimony – which is corroborated by the video footage – that Ferguson negatively responded "Mmm mmm," just as she had before in response to other questions, to his question as to whether she minded if he searched her vehicle.

2.  **Ferguson's Response Provided Valid Consent**

Having established that Ferguson responded "Mmm mmm" to Deputy Land's question as to whether she minded if he searched her vehicle, it is clear that Ferguson consented to a search of her vehicle. In other words, Deputy Land properly understood Ferguson's verbal negative response to indicate that she did not mind if he so searched. In Ferguson's post-hearing brief, she concedes that her argument that an "inarticulate" response cannot provide valid consent is entirely unsupported by any case law or binding authority, and she instead pivots to argue that the standard applicable to an invocation of the Sixth Amendment right to counsel should apply to consent. (See doc. no. 51, pp. 4-5.) In support of that argument, Ferguson cites to Davis v. United States, 512 U.S. 452, 459 (1994), wherein the court held that a police officer must ask clarifying questions when the officer understands only that a suspect *might* be invoking the right to counsel. Here, the Court declines to apply that rationale to the instant circumstances, not only because Davis concerned the right to counsel rather than the issue of consent, but also because the rationale that drives its reasoning – clarifying ambiguous responses – simply does not apply to the

17

instant case. As noted above, Ferguson unhesitatingly responded "Mmm mmm" to Deputy Land's question, a negative answer that she had previously employed on multiple occasions during their conversation, and Deputy Land properly interpreted that response as indicating that she did not mind if he searched her vehicle.

Moreover, the Court finds compelling the government's argument in its supplemental brief as to the application of United States v. Washington, 319 F. App'x 781 (11th Cir. 2009) (*per curiam*). (See doc. no. 52, pp. 3-4.) In that case, the court found valid consent when, in response to a police officer's request for consent to search defendant's vehicle, defendant said, "That'd be fine if you have a key," and additionally explained that his girlfriend had left with the keys and that he did not know when she would return. Washington, 319 F. App'x at 781-82. Shortly thereafter, the police officer found a key to the vehicle on the ground, unlocked the vehicle, conducted a search, and found cocaine. Id. at 782. Although the defendant argued that he had not given unequivocal consent to the search – or, in other words, that his consent was ambiguous – the court found that the police officer's "interpretation of the events surrounding the consent [was] reasonable," and that the consent was valid. Id. Here, Ferguson's response to Deputy Land's request for consent was considerably *less* ambiguous than that given by the defendant in Washington, in that she provided a negative response in the same manner in which she had responded to four previous questions. Thus, the Court easily concludes that Deputy Land's understanding of that response as a grant of consent was a "reasonable interpretation of the events surrounding the consent." Id.

As to Ferguson's argument that, even if she *did* give consent to search, that consent

was not voluntarily given (doc. no. 34-1, pp. 12-13), that argument is likewise unavailing. When the government attempts to justify a search on the basis of a subject's consent, "the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). Moreover, whether consent is voluntary is "a question of fact to be determined by the totality of the circumstances," United States v. Duncan, 356 F. App'x 250, 252 (11th Cir. 2009) (*per curiam*), and the government "bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily, United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989). See also United States v. Watson, 423 U.S. 411, 424 (1976).

Here, Ferguson argues that, assuming she gave consent, her consent was not voluntary but rather an acquiescence to a claim of lawful authority based on the duration of the traffic stop and on Deputy Land having confiscated Ferguson's firearm. (Doc. no. 34-1, pp. 12-13.) The Court finds that argument unpersuasive. First, as the Court explained supra Part II.B.2, the duration of the traffic stop was properly limited to the time necessary to effectuate the purpose of the stop; accordingly, the Court is entirely unconvinced that the relatively brief duration of the traffic stop somehow equated to a claim of lawful authority to which Ferguson simply acquiesced.

Next, Deputy Land's confiscation of Ferguson's firearm is supported by a long line of case law indicating that such actions are appropriate in order to secure officer safety. See Purcell, 236 F.3d at 1277 (citing United States v. Hensley, 469 U.S. 221, 235 (1985) ("It

is well established that officers conducting a traffic stop may 'take such steps as [are] reasonably necessary to protect their personal safety.'"); see also Michigan v. Long, 463 U.S. 1032, 1049 (1983) (noting that an officer may seize any contraband, including weapons, in plain view, and may conduct a protective search of a vehicle for safety purposes); Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977) (noting that an officer may conduct a protective search of a vehicle's driver and its passengers to secure officer safety); United States v. Mackey, 149 F. App'x 874, 880 (11th Cir. 2005) (*per curiam*).

Here, as the government correctly points out, Deputy Land did not seize Ferguson's firearm following a protective search of Ferguson or her vehicle, but instead confiscated it after it fell out of the glove compartment of Ferguson's vehicle when she opened that compartment to retrieve her vehicle registration, such that it was in plain view. (FTR 2:03:41-04:12.) In doing so, Deputy Land was acting well within his legal rights as a police officer, see Michigan, 463 U.S. at 1049, and he did not, by securing Ferguson's firearm, engage in any actions resembling a search that would have indicated to Ferguson that he was simply entitled conduct such a search. Thus, the Court finds that Ferguson's consent was given voluntarily and not as acquiescence to a claim of lawful authority.

### III.  CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Ferguson's motion to suppress be **DENIED**. (Doc. no. 34.)

SO REPORTED and RECOMMENDED on this 27th day of May, 2013, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE